**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

JOHN G. REYNARD,
           *Defendant-Appellant.*

No. 02-50476

D.C. No.
CR-98-02402-IEG

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, District Judge, Presiding

Submission Deferred April 9, 2003
Argued and Submitted December 14, 2004
Submission Vacated and Deferred January 4, 2006
Resubmitted July 12, 2006
Pasadena, California

Filed January 12, 2007

Before: Harry Pregerson, A. Wallace Tashima, and
Richard R. Clifton, Circuit Judges.

PREGERSON, J., delivered the opinion of the Court as to
Parts I through II(D), in which TASHIMA and CLIFTON,
JJ., joined. CLIFTON, J., delivered the opinion of the Court
as to Part II(E), in which TASHIMA, J., joined.
PREGERSON, J., filed a dissenting opinion as to Part II(E)
and dissents from the judgment.

## COUNSEL

Steven F. Hubachek, Federal Defenders of San Diego, Inc., San Diego, California, attorney for the defendant-appellant.

Mark R. Rehe, Assistant United States Attorney, San Diego, California, attorney for the plaintiff-appellee.

## OPINION

PREGERSON, Circuit Judge, with whom TASHIMA and CLIFTON, Circuit Judges, join:

Appellant John G. Reynard seeks review of the district court's decision to revoke his supervised release. The district court revoked Reynard's supervised release because he refused to proffer a blood sample, as required by the DNA Analysis Backlog Elimination Act of 2000 ("DNA Act"), Pub. L. No. 106-546, 114 Stat. 2726 (2000), (codified at 42

U.S.C. § 14135a (2000)). Failure to provide a blood sample constituted a violation of the terms of his supervised release. Reynard appeals, contending that the DNA Act (1) violates the Fourth Amendment, (2) is impermissibly retroactive, (3) violates the Ex Post Facto Clause, (4) violates the Commerce Clause, and (5) violates the Fifth Amendment. For the reasons stated below, we affirm the district court's revocation of Reynard's supervised release.

## I.   FACTUAL AND PROCEDURAL HISTORY

### A.   Factual Background

#### 1.   *The Underlying Crime*

On July 23, 1998, Reynard entered a San Diego Bank of America branch and handed the teller a note demanding that she empty the cash drawer and warning her that he possessed a gun. The teller gave Reynard $2,325. Reynard took the money and fled but turned himself in to a Federal Bureau of Investigation ("FBI") office a few days later. He admitted to having committed the robbery. Reynard explained that he was a habitual drug user and that his habit motivated the crime.

On August 5, 1998, a grand jury indicted Reynard for one count of bank robbery, in violation of 18 U.S.C. § 2113(a). Reynard pleaded guilty on October 5, 1998. On December 21, 1998, he was sentenced to thirty months in custody, followed by three years of supervised release. The court ordered Reynard to comply with several conditions of supervised release, including that he (1) "[s]ubmit to a search of person, property, residence, abode or vehicle at a reasonable time and in a reasonable manner by the Probation Officer," and (2) refrain from "commit[ting] another federal, state, or local crime." Reynard's supervised release commenced in November 2000.

## 2. *History and Passage of the DNA Act*

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act, authorizing the FBI to establish a national index of DNA samples from convicted federal offenders. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (Sept. 13, 1994). The FBI exercised this authority by creating the Combined DNA Index System ("CODIS"), a national DNA index.[1] In addition, all fifty state legislatures enacted statutes requiring convicted offenders to provide DNA samples for entry into the CODIS system. *See* H.R. Rep. No. 106-900(I), at 8 (Sept. 26, 2000).

Between 1994 and 1996, however, the FBI lacked the authority to include DNA data from federal offenders in the CODIS databank. *See id.* In 1996, Congress, as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), expressly provided the FBI with authority to include in CODIS all DNA samples taken from federal offenders. *See* AEDPA § 811(a)(2), Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996) (providing that the Director of the FBI "may expand the combined [CODIS] to include Federal crimes and crimes committed in the District of Columbia"). At least one member of Congress believed that the 1996 legislation authorized the FBI to begin collecting DNA samples from federal offenders immediately.[2]

---

[1]CODIS is a national database used by qualified "law enforcement officials to link DNA evidence found at a crime scene with a suspect whose DNA is already on file." 146 Cong. Rec. S11645, S11647 (daily ed. Dec. 6, 2000) (statement of Sen. Kohl).

[2]*See* 146 Cong. Rec. at S11647 ("We thought we already closed this loophole through 1996 legislation which provides that the FBI 'may expand the database to include federal crimes . . .,' but federal officials claim more express authority is necessary. We are not so sure they're right, but there is no need to wait any longer.") (statement of Sen. Kohl); *id.* at S11646 ("[D]uring consideration of the Anti-Terrorism Act of 1996, [Senator Dewine] proposed a provision under which federal convicted offenders' DNA would be included in CODIS. Unfortunately, the Department of Justice never implemented this law, though currently all 50 states collect DNA from convicted offenders.") (statement of Sen. Kohl).

At some point after the passage of AEDPA, the Department of Justice ("DOJ") reached the conclusion that the 1996 legislation did not vest it with sufficient authority to collect DNA samples from federal offenders. *See* H.R. Rep. No. 106-900(I), at 9. In December 1998, the FBI requested that Congress enact more explicit statutory authority to allow the FBI to take DNA samples from federal offenders for inclusion in CODIS. *See id.* On December 19, 2000, Congress passed the DNA Act. The DNA Act requires the United States Probation Office ("Probation Office") to collect a DNA sample from any probationer, parolee, or supervised releasee "who is, or has been, convicted of a qualifying offense." 42 U.S.C. § 14135a(a)(2). Bank robbery is a qualifying offense. *See id.* § 14135a(d)(1)(E). The DNA Act requires cooperation in the collection of DNA as "a condition of . . . probation, parole, or supervised release." *Id.* § 14135a(a)(5). The DNA Act punishes with a misdemeanor anyone "who fails to cooperate in the collection of" a DNA sample. *Id.* Once the sample is taken, the Probation Office gives it to the FBI for analysis and entry into CODIS. *See* 42 U.S.C. § 14135a(b).

### 3.  *Proceedings in District Court*

On May 31, 2002, the Probation Office notified Reynard's counsel by letter that the DNA Act required Reynard to give a blood sample. The letter stated that a probation officer would soon contact Reynard to arrange for the taking of a blood sample. The letter further noted that failure to cooperate in the collection of the blood sample: (1) would be a Class A misdemeanor; and (2) would constitute a violation of Reynard's mandatory conditions of supervision. Reynard met with Probation Officer David Dilbeck on June 4, 2002. At the meeting, Reynard received a one-page "DNA Collection Letter of Instruction," which again informed Reynard that compliance with the DNA Act was mandatory and that his failure to comply would constitute a Class A misdemeanor and a violation of a mandatory condition of his supervised release. Reynard signed the letter, indicating that he "underst[ood] the

requirements and agree[d] to abide by them." On the same day, Reynard received notice that he should arrive for a blood draw at a Probation Office on June 10, 2002.

On June 10, 2002, Reynard appeared for his appointment. However, after a discussion with his attorney, Reynard refused to have his blood drawn. On June 13, 2002, Probation Officer Dilbeck petitioned for an Order to Show Cause ("OSC") why Reynard's supervised release should not be revoked. Specifically, Officer Dilbeck alleged that Reynard violated a mandatory condition of supervision when he "declined to cooperate in the collection of his blood in order to obtain a DNA sample, in violation of 42 U.S.C. § 14135a." On July 11, 2002, Reynard filed a motion to dismiss Probation Officer Dilbeck's OSC petition. Reynard's motion raised eight issues:

(1)    whether applying the DNA Act to Reynard would be impermissibly retroactive under *INS v. St. Cyr*, 533 U.S. 289 (2001);

(2)    whether applying the DNA Act to Reynard would be impermissibly retroactive under principles of due process;

(3)    whether applying the DNA Act to Reynard would violate the prohibition against Ex Post Facto laws;

(4)    whether applying the DNA Act to Reynard would be an unlawful bill of attainder;

(5)    whether mandatory collection of a DNA sample from Reynard falls outside the "special needs exception" to the Fourth Amendment;

(6)    whether the DNA Act violates separation of powers principles;

(7)    whether the DNA Act violates the Commerce
        Clause; and

(8)    whether compelled extraction of blood samples
        under the DNA Act violates the Fifth Amend-
        ment privilege against self-incrimination.

On August 6, 2002, the district court conducted a hearing
on the motion. Twenty days later, the district court denied
Reynard's motion in a thorough published opinion. *See
United States v. Reynard*, 220 F. Supp. 2d 1142 (2002). On
September 3, 2002, the district court conducted an evidentiary
hearing and found the allegations contained in the OSC to be
true. The court revoked Reynard's supervised release, but
then reinstated it with the additional requirement that Reynard
give a blood sample. The final judgment and commitment
order was filed the same day.

## B.   Reynard's Appeal

On September 4, 2002, Reynard filed a timely Notice of
Appeal. In his appeal, Reynard raises five issues. First, he
asserts that the DNA Act violates the Fourth Amendment
because it authorizes a search without requiring individual-
ized suspicion. Second, Reynard contends that application of
the DNA Act is impermissibly retroactive. Third, Reynard
argues that this retroactive application of the DNA Act vio-
lates the Constitution's Ex Post Facto Clause. Fourth, Rey-
nard maintains that the DNA Act is unconstitutional because
Congress lacked power under the Commerce Clause to enact
it. Finally, Reynard suggests that the Act violates his Fifth
Amendment rights by forcing him to incriminate himself by
producing evidence.

## II. DISCUSSION

### A. The DNA Act Does Not Violate the Fourth Amendment

Reynard contends that the DNA Act violates the Fourth Amendment because it authorizes a search without requiring individualized suspicion. Analysis of this issue is foreclosed by *United States v. Hugs*, 384 F.3d 762, 769 (9th Cir. 2004) (citing *United States v. Kincade*, 379 F.3d 813 (9th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 924 (2005)), which held that the DNA Act does not violate the Fourth Amendment.

### B. The DNA Act Does Not Have an Impermissibly Retroactive Effect on Reynard

Reynard contends that the DNA Act is impermissibly retroactive.[3] The district court disagreed, finding that the "retrospective application of the DNA Act is not arbitrary and irrational, but is consistent with Congress's intent in passing the law — i.e., to include DNA samples from federal offenders in the CODIS databank, with all possible speed." *See Reynard*, 220 F. Supp. 2d at 1157. For the reasons set forth below, we affirm this holding.

#### 1. Standard of Review

We review *de novo* whether a statute may be applied retroactively. *See Scott v. Boos*, 215 F.3d 949, 942-43 (9th Cir. 2000).

---

[3]Courts use interchangeably the terms "retroactive" and "retrospective." *See SEC v. Fehn*, 97 F.3d 1276, 1285 (9th Cir. 1996) (recognizing that the Supreme Court uses the terms "retroactive" and "retrospective" interchangeably); *see also* Black's Law Dictionary (8th ed. 2004) (defining "retrospective" as "see retroactive"). For convenience, we use the term "retroactive," unless that would require changing the language of a quotation.

### 2.   *Governing Legal Principles - the* St. Cyr/ Landgraf *Test*

**[1]** Courts apply a two-step test to determine whether legislation is impermissibly retroactive. This test is set forth in *INS v. St. Cyr*, 533 U.S. 289, 316 (2001), and *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994). The first step requires that we "ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively." *St. Cyr*, 533 U.S. at 316. The statutory language must be "so clear that it [can] sustain only one interpretation." *Id.* at 317. If Congress's intent is sufficiently clear from the text and legislative history, then the statute may be applied retroactively, and the court need not address the second step. *See id.* at 316 ("[I]t is beyond dispute that . . . Congress has the power to enact laws with retrospective effect" where Congress clearly intends to do so).

**[2]** Step two must be employed where Congress's retroactive intent is not clear. We must then determine whether application of the act violates the Due Process Clause and consequently has a "retroactive effect." *Landgraf*, 511 U.S. at 280. "If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*

### 3.   *Application of the* St. Cyr/Landgraf *Test*

#### a.   *Step One*

The government points to four sources to support its contention that Congress intended unambiguously for the DNA Act to apply to offenders who committed qualifying offenses prior to the Act's passage. First, the Act states that the Probation Office "shall collect a DNA sample from each [individual on release, parole, or probation] who is, or has been, convicted of a qualifying Federal offense . . . ." Pub. L. No. 106-546 (codified at 42 U.S.C. § 14135a(a)(2)). The government

UNITED STATES v. REYNARD

contends that because a portion of the language is cast in the past tense, it covers individuals, like Reynard, who are now on supervised release, but who "ha[ve] been" convicted of a qualifying offense.[4] Second, the Act also provides that a DNA sample will be collected "from each individual in the custody of the Bureau of Prisons who is, or *has been*, convicted of a qualifying Federal offense." *Id.* § 14135a(a)(1) (emphasis added). Third, the government contends that a review of the DNA Act's legislative history emphasizes that the Act was intended to apply retroactively.[5]

Finally, as noted by the government, the Congressional Budget Office's ("CBO") cost estimate of the DNA Act observed that "there are roughly 6,000 such persons now and that there would be another 2,000 persons incarcerated in fiscal year 2001 and in each year thereafter." The government contends that the fact that the CBO included current inmates in its calculation is further evidence that Congress intended retroactive application of the DNA Act.

[3] Although the statutory provisions and legislative history discussed above suggest that Congress may have intended the

---

[4]The government also asserts that the fact that this subsection applies to "parolees" necessarily demonstrates a retroactive intent because federal parole was abolished over fifteen years before in the Sentencing Reform Act of 1984.

[5]Congress noted that the Act would serve to fill a significant gap in CODIS by including all qualifying offenders who have committed a qualifying offense at any time in the past. *See* 146 Cong. Rec. H8572-01, H8576 (daily ed. Oct. 2, 2000) ("One glaring omission in the law that authorized CODIS is that it did not authorize the taking of DNA samples from persons convicted of Federal offenses . . . ." ) (statement of Rep. Canady); 146 Cong. Rec. S11645-02, S11647 ("[F]or some inexplicable reason, we do not collect samples from Federal . . . offenders. We thought we already closed this loophole through 1996 legislation . . . but Federal officials claim more express authority is necessary.") (statement by Sen. Kohl); H.R. Rep. 106-900(I), at 8 ("[The DNA Act] addresses . . . the absence of legal authority for DNA samples to be collected from persons convicted of Federal crimes . . . .").

DNA Act to apply retroactively, the district court correctly determined that Congress failed to meet the high standard of clear and unambiguous expression of intent. *See Reynard*, 220 F. Supp. 2d at 1149 (holding that "the text and legislative history of the DNA Act are not so clear that [they] could sustain only one interpretation" (internal quotations and citations omitted)). For example, the plain language of the DNA Act does not clarify the extent to which the Act applies. While the DNA Act (42 U.S.C. §§ 14135a(a)(1) and (2)) expressly apply to a person who "has been" convicted of a qualifying offense, this language does not demonstrate that Congress "affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf*, 511 U.S. at 272-73.

In addition, although Congress may have passed the DNA Act to fill "gaps" in CODIS, it does not necessarily follow that the Act was intended to apply retroactively. In fact, as the district court reasonably noted, "congressional silence on the retroactivity or non-retroactivity of the DNA Act is significant in itself." *Reynard*, 220 F. Supp. 2d at 1150; *see also Castro-Cortez v. Ashcroft*, 239 F.3d 1037, 1052 (9th Cir. 2001) ("Congressional silence is instructive"), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422 (2006). Finally, although the CBO report certainly provides support for construing the DNA Act to be retroactive, it can hardly be deemed conclusive evidence of Congress's intent — particularly, in light of the absence of clear corroborating evidence in the legislative history.

**[4]** Therefore, although the DNA Act's text and legislative history suggest that it was intended to apply retroactively, the existence of plausible alternatives preclude us from finding the clear and unambiguous intent necessary to satisfy this first *St. Cyr/Landgraf* step. *See United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34-37 (1992) (the existence of any "plausible" alternative interpretations of statutory language necessarily

precludes that language from qualifying as an "unambiguous" expression). Accordingly, we must proceed to the second step.

b. *Step Two*

**[5]** We must next determine whether application of the statute would have a retroactive effect within the meaning of *Landgraf* and consequently violate Reynard's due process rights. *See Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 601 (9th Cir. 2002) (citing *Landgraf*, 511 U.S. at 280). A retroactive effect is one that (1) impairs rights Reynard possessed when he acted, (2) increases Reynard's liability for past conduct, or (3) imposes new duties with respect to transactions already completed. *See Landgraf*, 511 U.S. at 280. A statute that has such a retroactive effect cannot be applied to the litigant before the court. *See United States v. Hovsepian*, 359 F.3d 1144, 1156 (9th Cir. 2004); *Jimenez-Angeles*, 291 F.3d at 601.

**[6]** Addressing the third *Landgraf* category, the district court recognized that the DNA Act imposes a "duty" on Reynard to submit to the physical intrusion of blood extraction and also creates a "disability" by incorporating his DNA information in a nationwide database. *Reynard*, 220 F. Supp. 2d at 1153. However, the district court reasoned that this "duty" was not new for purposes of its retroactivity analysis because Reynard was warned at his supervised release hearing that he was subject to a broad duty to "[s]ubmit to a search of person, property, residence, abode or vehicle at a reasonable time and in a reasonable manner by the Probation Officer." *Id.* Although Reynard's duty to submit to a search may have not been clearly defined at the time to include blood extraction, he was aware that the terms of supervised release could be modified in the future. *See* 18 U.S.C. § 3583(e)(2) (authorizing a court to "modify, reduce, or enlarge the conditions of supervised release at any time prior to the expiration or termination of the terms of supervised release").

Further, any "disability" created by operation of the DNA Act is minimal and does not upset any reliance interest that Reynard may have had. As the district court noted, DNA samples in CODIS are composed of genetic markers (known as "junk sites") which "are purposely selected because they are not associated with any known genetic trait." *Reynard*, 220 F. Supp. 2d at 1152 (citing H.R. Rep. 106-900(I), at 26).

**[7]** Moreover, the legislative history of the DNA Act suggests that federal defendants in October of 1998, when Reynard pleaded guilty, were not acutely aware of any *non*-obligation to provide a DNA sample because a federal law already existed by which Congress attempted to create such an obligation.[6] Accordingly, the Act's legislative history undermines the proposition that, in 1998, federal offenders pleaded guilty with an expectation that they would not have to contribute DNA to CODIS because, at that time, federal law expressly authorized the FBI to expand CODIS by including DNA samples from all such federal offenders. Accordingly, Reynard did not have a settled expectation that he would not have to submit to DNA extraction.

Reynard's primary challenge is to the constitutionality of such a search (the constitutionality of which was upheld in *Kincade*, 379 F.3d 813, and reaffirmed in *Hugs*, 384 F.3d at 769), but this argument does not defeat the government's con-

---

[6]In October 1998, DOJ believed that AEDPA section 811(a)(2) continued to authorize the FBI to include DNA samples from all federal offenders in the CODIS index. *See Reynard*, 220 F. Supp. 2d at 1155. Two months later, in December 1998, the FBI requested Congress to enact more explicit statutory authority to allow the FBI to take DNA samples from federal offenders for inclusion into CODIS. *See* H.R. Rep. No. 106-900(I). Thus, in October 1998, when Reynard pleaded guilty to robbery, federal law appeared to grant the FBI authority to collect a DNA sample from Reynard, even though DOJ believed that Congress had not conferred sufficient authority to do so.

tention that the DNA extraction falls within the scope of Reynard's 1998 duty to submit to a search.[7]

[8] Thus, in analyzing the second *St. Cyr/Landgraf* step, the district court correctly concluded that the DNA Act did not have an impermissibly retroactive effect on Reynard. *See Reynard*, 220 F. Supp. 2d at 1157.

## C. The DNA Act Does Not Violate the Ex Post Facto Clause

Reynard contends that application of the DNA Act to him violates the Ex Post Facto Clause. For the reasons set forth below, we reject this claim.

---

[7]Reynard makes two additional arguments to support his contention that the DNA Act is impermissibly retroactive. First, he contends that *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997), compels finding a different result. In *Hughes Aircraft*, the Court noted that the creation of a new cause of action against a party could yield an impermissibly retroactive effect. *See id.* at 947. Reynard claims that his case is analogous to *Hughes Aircraft* because failure to comply with DNA Act constitutes a new misdemeanor offense and a new basis on which to violate a supervisory sentence. Specifically, Reynard questions the district court's focus on reliance interests because he feels that the Supreme Court did not consider them in *Hughes Aircraft*. However, *Hughes Aircraft* did not overrule *St. Cyr* or *Landgraf*, which clearly state that reliance is an important factor in the retroactivity analysis. *See St. Cyr*, 533 U.S. at 325; *Landgraf*, 511 U.S. at 270.

Second, Reynard argues that the district failed to undertake the "commonsense" inquiry required by the second *St. Cyr/Landgraf* step. *See St. Cyr*, 533 U.S. at 321 ("The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events complete before its enactment." (internal quotations and citations omitted)). Because it thoroughly discussed Reynard's potential reliance and settled expectations, *see Reynard*, 220 F. Supp. 2d at 1151-57, the district court did not fail to conduct a "commonsense" inquiry.

### 1.  Standard of Review

A district court's ruling that the Ex Post Facto Clause was not violated is reviewed *de novo*. *See Hunter v. Ayers*, 336 F.3d 1007, 1011 (9th Cir. 2003).

### 2.  Governing Legal Principles

**[9]** The Constitution's Ex Post Facto Clause forbids the passage and application of laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Calif. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 41 (1990)). Specifically, the Clause forbids:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Rogers v. Tennessee*, 532 U.S. 451, 456 (2001) (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L. Ed. 648 (1798) (emphasis omitted)). Reynard contends (1) that the DNA Act unlawfully establishes a crime based on an action committed before the DNA Act was enacted, and (2) that the DNA Act changes the punishment or inflicts greater punishment for refusing to submit a blood sample than the law allowed when Reynard was convicted.

### 3. The DNA Act Does Not Criminalize Conduct That Was Innocent When Committed

The DNA Act establishes a misdemeanor offense for anyone "who fails to cooperate in the collection of" a DNA sample. Pub. L. No. 106-546 (codified at 42 U.S.C. § 14135a(a)(2)). Reynard claims that the DNA Act establishes a crime based solely on an act (or omission) committed before the DNA Act's enactment.[8] In response, the government asserts that the DNA Act does not criminalize any act (or omission) that Reynard committed prior to passage of the Act. Rather, Reynard's refusal to give blood occurred over eighteen months after Congress passed the DNA Act. Thus, the government argues, the DNA Act criminalizes only new conduct — Reynard's June 10, 2002 refusal to comply with the DNA Act, which occurred more than eighteen months after the Act's enactment — not Reynard's conduct predating the Act.

[10] The DNA Act allows the Probation Office to revoke Reynard's supervised release based on Reynard's June 10, 2002 refusal to submit a blood sample. The Act does not criminalize an act (or omission) that occurred *prior* to enact-

---

[8]Reynard concedes the existence of cases stating that it is permissible to prohibit an individual from engaging in specific conduct based on a prior conviction sustained before the criminal statute's enactment. *See United States v. Mitchell*, 209 F.3d 319, 322-23 (4th Cir. 2000). Reynard distinguishes such cases by asserting that the DNA Act does not criminalize conduct but instead criminalizes an *omission* that was innocent prior to passage of the DNA Act — namely, the failure to contribute blood to the CODIS databank.

Reynard's assertion that he "has not engaged in conduct after the enactment of the DNA Act but rather omitted to cooperate" is unpersuasive. Had Reynard *not* been informed of the DNA Act and the consequences of failing to comply, it would seem unreasonable to find Reynard liable for failing to give a DNA sample. However, Reynard was fully aware of the consequences when he refused to have his blood drawn. His refusal to submit to the blood extraction was clearly an affirmative action, not an omission, as anticipated by the DNA Act.

404 UNITED STATES v. REYNARD

ment of the DNA Act. Thus, the district court properly concluded that the DNA Act does not criminalize Reynard's pre-DNA Act actions. *See Reynard*, 220 F. Supp. 2d at 1160 ("Thus, the DNA Act does not criminalize an act (or omission) that occurred prior to enactment of the DNA Act. Instead, the DNA Act criminalizes Reynard's June 10, 2002 failure to comply with the previously enacted DNA Act.").

### 4. *The DNA Act Does Not Change or Inflict Greater Punishment than the Law Allowed at the Time of Reynard's Conviction*

Reynard next argues that application of the DNA Act to him violates the Ex Post Facto Clause because it increases his punishment for his 1998 conviction. Specifically, he asserts that "the DNA Act changes punishment or inflicts greater punishment than the law allowed when Reynard sustained his conviction." Reynard argues that the DNA Act imposes greater punishment on him because the Act exposes him to revocation of supervised release if he declines to allow the probation office to draw blood and that he did not face this potential for revocation prior to passage of the DNA Act. In response, the government asserts that the DNA Act does not increase Reynard's "punishment" for his 1998 conviction.

According to *Smith v. Doe*, 538 U.S. 84 (2003), we employ an "intent-effect" analysis to determine whether the DNA Act increases Reynard's punishment for his 1998 conviction.[9] *See*

---

[9]The parties dispute the applicable test for resolving this inquiry. Reynard asserts that *United States v. Paskow*, 11 F.3d 873 (9th Cir. 1993), is controlling authority, and that, under *Paskow,* his supervised release cannot be revoked on the basis of a DNA Act violation because the DNA Act was passed after Reynard's underlying conviction. *Paskow* involved an amendment to the supervised release statute which provided a mandatory jail term for persons who violated release by possessing drugs. *See id.* at 876. Prior to the amendment, violation carried no mandatory minimum sentence. *See id.* at 883 (finding that the ex post facto clause is violated when an amendment to the supervised release statute disadvantages a

*id.* at 92. First, the we must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). If the intention of the legislature was to impose punishment, the inquiry ends and we defer to legislative intent. *See Hendricks*, 521 U.S. at 361. However, if the Legislature's intent was to enact a regulatory scheme that is civil and non-punitive, we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it civil." *Id.* (internal quotations omitted). Because a federal court will "ordinarily defer to the legislature's stated intent," *Hendricks*, 521 U.S. at 361, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," *Hudson v. United States*, 522 U.S. 93, 100 (1997) (internal quotations omitted).

Whether a statutory scheme is civil or criminal "is first of all a question of statutory construction." *Hendricks*, 521 U.S. at 361. We must consider the statute's text and structure to determine the legislative objective. *See Flemming v. Nestor*, 363 U.S. 603, 617 (1960). A conclusion that the legislature intended to punish would satisfy an Ex Post Facto challenge without further inquiry into its effects, so considerable deference must be accorded to the legislature's intent. *See Smith*, 538 U.S. at 92-93.

---

defendant who committed the underlying offense before the amendment became effective).

The government argues that *Paskow* does not control this case because the DNA Act does not increase penalties that defendants will face upon revocation of supervised release. Rather, the government argues, the DNA Act merely provides another way by which supervised release may be revoked. The government contends that we should be guided by an "intent-effect" analysis, as set forth in *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir. 1997). However, on March 5, 2003, six months after this appeal was filed, the Supreme Court decided *Smith* and clarified the test to be applied to claims of altered or increased punishment. *See Smith*, 538 U.S. at 92.

a.   *No Punitive Intent*

**[11]** A review of the legislative history of the DNA Act reveals that it was not enacted for punitive reasons. Rather, its goal was to "assist[ ] law enforcement by matching DNA evidence with possible suspects . . . in unsolved violent crimes." 146 Cong. Rec. H8572-01, H8577 (statement of Rep. Gilman). The Act would "save lives by allowing apprehension and detention of dangerous individuals while eliminating the prospects that innocent individuals would be wrongly held for crimes that they did not commit." 146 Cong. Rec. H8572-01, H8576 (statement of Rep. Scott). Accordingly, the legislative history suggests that the district court was correct in concluding that the DNA Act was not intended to be punitive. *See Reynard*, 220 F. Supp. 2d at 1151.

b.   *No Punitive Effect*

The Supreme Court has offered seven factors to guide our "effect" analysis:

A.   Whether the sanction involves an affirmative disability or restraint;

B.   Whether it has historically been regarded as a punishment;

C.   Whether it comes into play only on a finding of scienter;

D.   Whether its operation will promote the traditional aims of punishment — retribution and deterrence;

E.   Whether the behavior to which it applies is already a crime;

F.   Whether an alternative purpose to which it may rationally be connected is assignable for it; and

    G.   Whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). The district court found that the DNA Act is not "so punitive" in effect as to outweigh Congress's non-punitive intent. *See Reynard*, 220 F. Supp. 2d at 1162. After analyzing the facts of this case in light of the seven *Mendoza-Martinez* factors, we reach the same conclusion.

**[12]** With respect to the first *Mendoza-Martinez* factor, the DNA Act *does* confer an affirmative disability. However, as discussed earlier, that disability is minimal. *See Smith*, 538 U.S. at 86; *Skinner v. Railway Labor Exec. Ass'n*, 489 U.S. 602, 625 (1989). Second, neither blood nor DNA collection have been historically viewed as punishment. *See Smith,* 538 U.S. at 86 ("[T]he regulatory scheme, in its necessary operation, has not been regarded in the Nation's history and traditions as a punishment."). Next, the penalty provisions of the DNA Act do not require a specific showing of scienter, as required by the third *Mendoza-Martinez* factor. *See* Pub. L. No. 106-546 (codified at 42 U.S.C. § 14135a) (assigning a misdemeanor to anyone who "fails to cooperate in the collection" of a DNA sample).

**[13]** The fourth factor requires analysis whether the DNA Act promotes the goals of punishment. Legislative history suggests that Congress acknowledged that the DNA Act might help curb recidivism rates. *See* 146 Cong. Rec. S11645-02, S11646 ("Statistics show that many of these violent felons will repeat their crimes once they are back in society. Since the Federal Government does not collect DNA from these felons, however, the ability of law enforcement to rapidly identify likely suspects is slowed.") (statement of Sen. Dewine); *see also Kincade*, 379 F.3d at 839. However, not every law with a deterrent effect is punitive. *See United States v. Jack-*

*son*, 189 F.3d 820, 824 (9th Cir. 1999) (noting that "deterrence may also serve non-punitive goals" (internal citations omitted)). Further, the DNA does not have a retribution component because it does not "label[ ] the offender as more culpable than before," *Russell*, 124 F.3d at 1091, and "is not geared toward making [Reynard] understand and regret the severity of his crimes," *Jackson*, 189 F.3d at 824.

**[14]** Addressing the fifth factor, while the DNA Act does criminalize an individual's failure to submit to a blood draw, such non-compliance is punished as a separate offense, which diminishes potential Ex Post Facto problems. *See Russell*, 124 F.3d at 1088-89 (emphasizing fact that Ex Post Facto Clause is concerned with increased punishment for prior, not separate, offenses); *supra* Part II(C)(3). Because Reynard concedes that the DNA Act serves a non-punitive function, he necessarily concedes that there is a rational alternative purpose for the Act, as required by the sixth factor. The district court did not address the seventh factor in its analysis. Considering this factor in *Smith*, the Supreme Court noted that "[t]he question here is not whether the legislature has made the best choice possible to address the problem it seeks to remedy, but whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 89. Because the DNA Act is a reasonable means by which Congress can achieve and regulate a non-punitive goal, the Act meets this standard.

**[15]** After weighing the many factors, we find that the district court was correct in concluding that the DNA Act does not have a "punitive" effect sufficient to outweigh Congress's non-punitive intent. *See Reynard*, 220 F. Supp. 2d at 1162. In light of the *Mendoza-Martinez* factors, the DNA Act is not "so punitive" in effect as to outweigh Congress's non-punitive intent. Accordingly, the DNA Act does not violate the Ex Post Facto Clause.

**D. The Compelled Extraction of Blood Under the DNA Act Does Not Violate Reynard's Fifth Amendment Right Against Self-Incrimination**

**[16]** Reynard contends that the extraction of DNA information violates his Fifth Amendment right not to be subject to the compelled production of any incriminating evidence. To support this contention, Reynard cites to a concurring opinion in *United States v. Hubbell*, 530 U.S. 27 (2000), in which Justice Thomas states that "the Fifth Amendment privilege protects against the compelled production not just of incriminating testimony, but of any incriminating evidence." *Id.* at 49 (Thomas, J., concurring). However, Justice Thomas's concurring comments are not binding on us, and as the government is quick to point out, blood samples and DNA profiles are physical, rather than testimonial. *See Schmerber v. California*, 384 U.S. 757, 765 (1966) (holding that analysis of blood sample, taken without defendant's consent, did not violate defendant's Fifth Amendment rights); *United States v. Velarde-Gomez*, 269 F.3d 1023, 1030 (9th Cir. 2001) (en banc) (recognizing that blood characteristics are "physical evidence" that do "not engender Fifth Amendment protection").

**[17]** Therefore, the extraction of Reynard's DNA does not violate his Fifth Amendment rights.

CLIFTON, Circuit Judge, with whom TASHIMA, Circuit Judge, joins:

**E. The DNA Act Does Not Exceed the Commerce Clause Power of the Federal Government**

Reynard asserts that the DNA Act is unconstitutional because the federal government lacks the authority under the Commerce Clause to require a federal offender to provide a DNA sample as a condition of his supervised release. Reynard's argument lacks merit. The federal government's

authority to regulate the conditions of a federal offender's supervised release arises when the individual commits a federal crime. The federal government is not required to demonstrate that it has independent authority to impose each individual condition of supervised release upon an offender. Nonetheless, in this instance, the individual condition of supervised release at issue, standing alone, is a valid exercise of the federal government's authority pursuant to its Commerce Clause power. Further, such an exercise of Congress's Commerce Clause power does not offend principles of federalism.

### 1. The Federal Government's Authority to Dictate the Conditions of Reynard's Supervised Release Arose When He Was Convicted of Committing a Federal Crime

**[18]** Contrary to Reynard's arguments, we are not required to analyze whether Congress has the authority to impose upon him each individual condition of his supervised release. The federal government's authority to dictate all of the conditions of his supervised release arose when he committed a crime that Congress had the authority to identify as a federal offense. Here, Reynard pleaded guilty to violating 18 U.S.C. § 2113(a), (f), robbing a bank insured by the Federal Deposit Insurance Corporation. It is indisputable that Congress has the authority to classify this crime as a federal offense. *See United States v. Harris*, 108 F.3d 1107, 1109 (9th Cir. 1997) (explaining that the federal bank robbery statute is a permissible exercise of Congress's Commerce Clause power). The DNA Act requires DNA extraction as a condition of supervised release following conviction for qualifying offenses under 42 U.S.C. § 14135a. To the extent that these qualifying offenses are regulable by Congress under its Commerce Clause power as well, the DNA Act is a proper exercise of its Commerce Clause authority. *See United States v. Plotts*, 347 F.3d 873, 879 (10th Cir. 2003) (holding that the DNA Act, whether construed as a civil sanction for committing a quali-

fying federal offense or as a law enforcement tool, is "necessary and proper to the exercise of the Commerce Clause.").

**[19]** Since the federal government has the authority, under the Commerce Clause, to denominate Reynard's conduct a federal offense, it has the power to incarcerate him and impose upon him the terms of his supervised release, including requiring him to submit a DNA sample under the DNA Act. There is no requirement that each individual term of his supervised release be independently authorized under the Commerce Clause.

### 2. *The Federal Government Has the Authority to Enact the DNA Act under the Commerce Clause*

Nonetheless, in this instance, the requirement that Reynard submit a DNA sample under the DNA Act, standing alone, is a valid exercise of the federal government's Commerce Clause power. We start with first principles. The Constitution creates a federal government of enumerated powers; among those is the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. The Supreme Court has identified three broad categories of activity that Congress may regulate under the Commerce Clause: (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce and the persons or things in interstate commerce, and (3) intrastate activities that substantially affect interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995).

**[20]** The first and third categories of commerce are inapplicable to Reynard's case. The extraction of DNA and the subsequent inclusion of DNA data in the CODIS system do not affect the "channels of interstate commerce," such as navigable waterways, railroads, and highways. *See, e.g., Oklahoma v. Guy F. Atkinson, Co.*, 313 U.S. 508, 518 (1941). Neither are they intrastate activities of an economic nature that "sub-

stantially affect" interstate commerce. *See, e.g., Gonzales v. Raich*, 545 U.S. 1, 25 (2005). Hence, the extraction of DNA samples for inclusion in CODIS falls under the second *Lopez* category, as a "thing in commerce."

A DNA sample conveys information about a convicted federal offender's identity. The Court long ago concluded that non commercial activities involving nothing "more tangible than the flow of . . . information can constitute commerce." *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 549-50 (1944), *superseded by statute on other grounds*. In more recent years, the Court has also determined that personal, identifying information contained in DMV records is a " 'thin[g] in interstate commerce,' and that the sale *or release* of that information in interstate commerce is therefore a proper subject of congressional regulation." *Reno v. Condon*, 528 U.S. 141, 143 (2000) (*quoting Lopez*, 514 U.S. at 558-59) (emphasis added). Thus the Court made clear that Congress has the authority, under the Commerce Clause, to regulate the interstate release of personal information, even when this release does not involve a sale of the information and is thus non-economic in nature. *Id*. Based on the Court's decision in *Condon*, it appears clear that Congress can regulate the collection and release of DNA samples from federal offenders, because this personal, identifying information constitutes a thing in interstate commerce.[10]

---

[10]A difference does exist between the type of transaction that was being regulated in *Condon* and the type of transaction at issue here. In *Condon*, the individual actor that placed the information into the stream of interstate commerce was a state; whereas here, the entity that has created the regulation — the federal government — is the entity responsible for the release of the information. The parties have not raised the question of whether the federal government can regulate something that it, and nobody else, has placed into the stream of commerce, and we need not decide it here. As already explained, the federal government's authority to act in this instance arose when Reynard committed a federal crime, and thus each individual condition of his supervised release need not be independently justifiable under one of the federal government's enumerated powers.

### 3. Congress's Exercise of its Authority under the Commerce Clause Does Not Offend Principles of Federalism

**[21]** Furthermore, Congress's exercise of its Commerce Clause power in this situation does not offend principles of federalism. The *Lopez* Court warned against extending the scope of the Commerce Clause power to "effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 558. The DNA Act does not intrude upon areas of traditional state or local authority. The Act regulates only federal offenders. Moreover, it addresses a problem that the states are not capable of addressing on their own. In passing this legislation, Congress acknowledged that all fifty states had enacted legislation that required individuals convicted of state offenses to provide DNA samples for analysis and entry into the CODIS system. *See* H.R. Rep. 106-900 (I), at *8. Congress noted, however, that there was, at that time, no legal authority that allowed DNA samples to be collected from individuals convicted of federal crimes. *See id.* Since states do not have the power to authorize the collection of DNA samples from those convicted of federal crimes, this problem was one that the states were not capable of addressing on their own.

**[22]** Courts have consistently recognized that federal statutes enacted to help states address problems that defy a local solution constitute an appropriate exercise of Congress's Commerce Clause power, because this power includes the authority "to govern affairs which the individual states, with their limited territorial jurisdictions, are not fully capable of governing." *See, e.g.*, *Black*, 125 F.3d at 459 (quoting *South Eastern Underwriters Ass'n*, 322 at 552) (internal quotations omitted); *United States v. Sage*, 92 F.3d 101, 105 (2d Cir. 1996); *United States v. Faasse*, 265 F.3d 475, 488-489 (6th Cir. 2001). Consequently, we conclude that the DNA Act con-

stitutes a valid exercise of Congress's power pursuant to the Commerce Clause.

## CONCLUSION

Because Reynard's challenges to the revocation of his supervised release are unavailing, we AFFIRM.

---

PREGERSON, Circuit Judge, dissenting:

I believe that Congress lacked the authority to enact the DNA Act under the Commerce Clause. Accordingly, I must dissent from Part E of the court's opinion and from the court's judgment.

Every law enacted by Congress must be based on a power enumerated in the Constitution. *See Marbury v. Madison*, 5 U.S. 137 (1803). The Constitution gives Congress power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8. Congress enacted the DNA Act expressly under its commerce power. *See* H.R. Rep. No. 106-900(I), at 16. The modern interpretation of Congress's regulatory authority under the Commerce Clause is expansive but not without limits. *See United States v. Lopez*, 514 U.S. 549, 557 (1995). Courts may invalidate a congressional enactment upon a plain showing that Congress has exceeded its constitutional bounds. *See id.* at 577-78.

As the court's opinion properly recognizes, the Supreme Court has "identified three general categories of regulation in which Congress is authorized to engage under its commerce power:" (1) "the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, and persons or things in interstate commerce;" and (3) "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16 17 (2005) (citing *Perez v. United States*, 402 U.S.

146, 150 (1971); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). To be valid, a statute need only relate to one category. *See Condon*, 528 U.S. at 148-49. The first and third categories of Congressional authority to regulate instate commerce are not implicated by the facts of this case. Thus, there is a need to determine whether the passage of the DNA Act is grounded on a valid exercise of Congressional authority to regulate interstate commerce under the second category.

The district court found that the second category applies to this case and that the relevant case law supports the government's contention that DNA samples taken under the Act by drawing blood from parolees are "things in interstate commerce." *Reynard*, 220 F. Supp. 2d at 1174. The Supreme Court recently analyzed this category in *Condon*. In *Reno v. Condon*, 528 U.S. 141 (2000), South Carolina challenged the constitutionality of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721-25, Pub. L. No. 103-322, 108 Stat. 1796 (1994 ed. and Supp. IV), which regulates and restricts the ability of states and private actors to sell, use, or disclose the personal identifying data in department of motor vehicle ("DMV") records without a driver's consent. *See Condon*, 528 U.S. at 143. The Court noted that this personal identifying information is used by a variety of actors engaged in interstate commerce — from insurers, manufacturers, and marketers, to various public and private entities involved in matters related to interstate motoring. *See id.* at 148. The Court concluded that drivers' information is "an article of commerce," and that "its sale or release into the interstate stream of business is sufficient to support congressional regulation." *Id.*

The government contends that the DNA Act, like the DPPA, regulates the release and use of personal identifying data. The DNA Act seeks to regulate the collection of DNA samples as well as the transportation of such samples to the FBI, where the information is included in CODIS and made available to law enforcement personnel in all fifty states. *See*

*Reynard*, 220 F. Supp. 2d at 1173 ("[T]he DNA Act essentially regulates the collection and distribution of data — i.e., the DNA of certain federal offenders — for distribution and use around the country.").

The district court found that *Condon* suggests that Congress is empowered to regulate "things" in interstate commerce, even where such "things" are disclosed or released into the stream of commerce without any sale or other economic transaction. *See id.* at 1171-72 (citing *Condon*, 528 U.S. at 148); *see also United States v. Cummings*, 281 F.3d 1046, 1048 (9th Cir. 2002) ("Congress's Commerce Clause authority is broad enough to stretch beyond the simple regulation of commercial goods traveling in interstate and foreign commerce to include regulation of non-economic activities . . . ."). Because the DNA Act seeks to regulate and protect an instrumentality (or thing) in interstate commerce, the district court found that passage of the DNA Act fell within Congress's regulatory authority. *See Reynard*, 220 F. Supp. 2d at 1174 (citing *Lopez*, 514 U.S. at 557-58).

But, *Condon* is readily distinguishable from the instant case. As explained above, the DPPA regulates the release and use of drivers' personal information held by the DMV. In enacting the DPPA, the federal government sought to regulate a "thing" (information) that was already in the stream of commerce and was placed into the stream of commerce by local or state governments. *See Condon*, 528 U.S. at 148.

In contrast, by passing the DNA Act, Congress is attempting to regulate something that *it* — and nobody else — has put into the stream of commerce. Reynard's DNA — while housed in his body — is not a "thing" in interstate commerce until the government, under the DNA Act, compels the DNA's extraction by drawing blood from a parolee and places the DNA in the stream of commerce for analysis. Congress may not bootstrap its authority to regulate purely local activity under the Commerce Clause. If the government is allowed

to regulate anything that *it* puts into the stream of commerce, its powers under the Commerce Clause would be without limit. "To be sure, 'the power to regulate commerce, though broad indeed, has limits.' " *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 58 (2003) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 196 (1968)). By arguing that *Condon* authorizes Congress to regulate Reynard's DNA only after the government has placed it in interstate commerce, the government puts the proverbial cart before the proverbial horse.

Because passage of the DNA Act cannot be justified under any of the three "categories of regulation in which Congress is authorized to engage under its commerce power," *Raich*, 125 S. Ct. at 2205, I agree with Reynard that passage of the DNA Act exceeds Congress's power under the Commerce Clause.[1]

---

[1] In addressing similar challenges to the DNA Act, the Tenth Circuit found that it need not determine whether the DNA Act was properly enacted under the Commerce Clause because it reasoned that the "Act is a legitimate exercise of congressional power under the Necessary and Proper Clause." *United States v. Plotts*, 347 F.3d 873, 877 (10th Cir. 2003). The *Plotts* court concluded that the DNA Act either constitutes a civil sanction for the violation of a criminal law, *see id.* at 878, or a law enforcement tool, *see id.* at 879, and that the Necessary and Proper Clause provides a means of implementation and enforcement, s*ee id.* at 878-79. I believe that the Tenth Circuit misapprehends the Necessary and Proper Clause.

The Necessary and Proper Clause allows Congress to enact laws, subject to other constitutional constraints, "that bear a rational connection to any of its enumerated powers." *Id.* at 878 (quoting *United States v. Edgar*, 304 F.3d 1320, 1326 (11th Cir. 2002). To be sure, "[w]here necessary to make a regulation of interstate commerce effective, Congress may regulate even those interstate activities that do not themselves substantially affect interstate commerce." *Raich*, 545 U.S. at 35. However, as discussed earlier, the DNA Act does *not* bear a rational relationship to the Commerce Clause and it is not necessary to effectively regulate interstate commerce because there is no interstate commerce in federal supervised releasees' DNA. Congress' reliance on the Commerce Clause in enacting the DNA Act is an attempted rationalization for regulating "things" that the govern-

ment itself — and only the government — has put into the stream of commerce. *See M'Culloch v. Maryland*, 17 U.S. 316, 423 (1819) (rejecting congressional use of the Necessary and Proper Clause, "under the pretext of executing its powers, [to] pass laws for the accomplishment of objects not intrusted to the government").